Filed 6/3/14  Sutter Health Wage and Hour Cases CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SUTTER HEALTH WAGE AND HOUR CASES | A137875<br><br>(Alameda County<br>Super. Ct. No. JCCP 4547) |

Appellants Diane Aymer, Jackie Brown, Deborah Klacik, Heidi Frausto, Clare King, and Danial Waltman sought certification of a putative class of approximately 21,000 registered nurses, as well as smaller subclasses.  They alleged that respondents denied them meal breaks and rest breaks, failed to provide adequate relief to allow them to take breaks, and dissuaded them from seeking premium pay for breaks they missed.  The trial court denied the certification motion based on a lack of predominating common questions.

Appellants contend the trial court erred, primarily because (1) in appellants' view, the court misinterpreted *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*) to permit certification only if the employer maintains a uniform policy precluding meal and rest breaks; (2) the court did not apply a rebuttable presumption that pay records showing missed, late or short meal periods establish prima facie violations of the applicable laws; and (3) the court did not expressly rule on appellants' theory that they were dissuaded from seeking meal and rest break premium pay.  We will affirm.

1

# I. FACTS AND PROCEDURAL HISTORY

## A. Plaintiffs' Complaints

In December 2008, three superior court actions were consolidated in Alameda County Superior Court as the *Sutter Health Wage and Hour Cases*, Judicial Council Coordinated Proceeding No. 4547: *Aymer v. Sutter Health et al.,* Sacramento County Superior Court case No. 34-2008-00003432-CU-OE-GDS (*Aymer*); *Bissett v. Sutter Health, Inc. et al.,* Alameda County Superior Court case No. RG08375261 (*Bissett*); and *Waltman v. Sutter Health*, Sacramento County Superior Court case No. 34-2008-00010291-CU-OE-GDS (*Waltman*). The plaintiffs in *Aymer* are the appellants in this appeal, and we refer to them as such. We refer to the plaintiffs in *Aymer*, *Bissett* and *Waltman* collectively as "Plaintiffs."

In May 2009, the court approved a stipulation permitting Plaintiffs to amend their complaints to name Sutter Health and 18 affiliate hospitals (collectively, Affiliates) as defendants. The operative pleadings in all three of the coordinated actions included causes of action for (1) failure to pay hourly and overtime wages, (2) failure to provide meal periods or compensation in lieu of meal periods, (3) failure to provide rest periods or compensation in lieu of rest periods, (4) failure to timely pay wages at separation, (5) failure to provide itemized wage statements, and (6) unfair business practices.

Plaintiffs' claims were based on California state wage and hour laws, including Labor Code sections 226.7, 512 (requiring meal periods), and 516 (pertaining to rest breaks). Appellants, however, chose to characterize these purported violations as a result of Sutter Health's "consistent polic[ies]." The *Aymer* complaint, for example, alleged that Sutter Health had "a consistent policy" of "failing to pay legal hourly and overtime wages" and requiring nurses to work without required rest and meal periods.

## B. Plaintiffs' Class Certification Motion

Plaintiffs filed a single class certification motion in August 2012. They sought certification of two "enterprise-wide" classes: (1) a "Registered Nurse" class of nonsupervisory, nonexempt, hourly registered nurses employed at any of the 19 Sutter Health Affiliates in California at any time since February 13, 2004, whose responsibilities

2

included direct patient care in an acute care (hospital) setting; and (2) a "Surgical Technician" class comprised of certain specified surgical technicians.

Alternatively, Plaintiffs sought a "subclass" (or alternative class) of registered nurses and surgical technicians in the Sutter Health Sacramento Sierra Region (SHSSR) and a subclass of registered nurses at Eden Medical Center (EMC).

At issue in this appeal are the enterprise-wide Registered Nurse class (RN class) and the SHSSR class.[1]

### 1. Sutter Health as the Entity Liable to the Putative Classes

Plaintiffs asserted that Sutter Health was the parent corporation of the other 18 affiliates, which operate 29 acute care hospitals in California. According to Plaintiffs, Sutter Health implemented enterprise-wide policies and practices and exercised substantial control over the affiliates and the working conditions of employees. As such, Plaintiffs asserted, Sutter Health was the class-wide employer and the entity liable to all class members.

### 2. Class Certification Requirements

Plaintiffs further asserted that the requirements for class certification were met, including ascertainability (based on Sutter Health's list of present and former nurses), numerosity (over 21,000 nurses), typicality, adequacy of representation, and—as relevant to this appeal—a predominance of common questions over individual questions.

The common questions identified by Plaintiffs included (1) whether Sutter Health failed to allow adequate meal breaks; (2) whether Sutter Health failed to allow adequate rest breaks; (3) whether Sutter Health failed to maintain sufficient staffing, thereby preventing nurses from taking meal breaks and rest breaks; and (4) whether Sutter Health had a practice of discouraging nurses from seeking premium pay to compensate for their missed or noncompliant meal or rest breaks, by dissuading or intimidating them from

---

[1] Appellants do not challenge the court's denial of certification as to the enterprise-wide class of surgical technicians, the subclass of EMC registered nurses, or the SHSSR class with respect to surgical technicians.

3

applying for premium pay, or failing to communicate adequately that missed or noncompliant breaks were eligible for premium pay.

Plaintiffs proposed that these questions could be answered by proof common to class members using statistical evidence (from Sutter Health's timekeeping and payroll records), Sutter Health's policies, Sutter Health's records of premium payments, survey evidence, and anecdotal evidence in the form of declarations from Plaintiffs and putative class members.

### a. Statistical Evidence Indicating Meal Period Violations

Plaintiffs urged that class-wide proof of meal period violations could be established by Sutter Health's electronic timekeeping and payroll records. According to declarations by Plaintiffs' expert witness, Reed F. Simpson, Sutter Health's records were analyzed to determine the number of putative class members' work days and, for shifts greater than six hours, the number of missed, late, or short meal periods. Based on his analysis, Simpson concluded there were over 4.4 million meal periods that were missed, late, or short, out of approximately 7 million shifts of six hours and over.

### b. Anecdotal Evidence of Understaffing Precluding Breaks

Plaintiffs also argued that nurses' meal and rest break violations were subject to common proof because they arose from Sutter Health's understaffing. On this point, Plaintiffs provided materials regarding the implementation of "nurse-to-patient staffing ratio" legislation (see Health & Saf. Code, § 1276.4), which essentially requires hospital employers to maintain minimum staffing ratios. As a result, they contended, acute care nurses could not leave their posts to take meal or rest breaks unless Sutter Health provided an adequately trained nurse for relief. A compendium of declarations from putative class members alleged that, due to the rigors of the job and Sutter Health's refusal to provide break relief, they were regularly required to work through meal periods and rest breaks.

### c. DLSE and CNA Claims of Missed Meal and Rest Breaks

Plaintiffs submitted a summary of documents from the California Division of Labor Standards Enforcement (DLSE), purportedly evincing Sutter Health's failure to

4

compensate employees for missed meal and rest breaks. In addition, they provided copies of grievance letters from the California Nurses Association (CNA), complaining of Sutter Health's failure to staff units in a manner that permitted nurses to take their breaks.

### d. *Dissuasion from Seeking Premium Pay for Missed Breaks*

Sutter Health maintains an enterprise-wide "premium pay" program by which nurses who do not receive a compliant meal or rest break may obtain a premium payment. (See Lab. Code, § 226.7.) From 2004 through October 2007, premium pay for missed meal and rest breaks was not automated, and employees had to request it. From October 2007 to October 2008, Sutter Health automatically paid premiums for eight-hour-shift employees' missed meal periods based on timekeeping records. Thereafter, however, premium payments were made only if requested. Plaintiffs' declarants alleged that their supervisors discouraged them from requesting premium pay for missed or noncompliant meal or rest breaks.

### e. *Eigen's Theoretical Survey*

Plaintiffs submitted a declaration of Zev J. Eigen, a purported expert in survey design and implementation, stating it would be feasible to design and implement a survey to determine why employees did not receive meal or rest breaks as required, and why premium payments were not made. Essentially, Eigen would survey a sampling of the putative class members and extrapolate the results to the rest of the class. No such survey, however, was actually conducted.[2]

C. Defendants' Opposition to Class Certification

Sutter Health denied it could be considered a single employer of all putative class members, and disputed that Plaintiffs' claims were amenable to class treatment.

---

[2] In addition to their claims for noncompliant meal and rest breaks, Plaintiffs argued that their derivative claims for failure to pay wages in a timely manner (Lab. Code, § 203), failure to provide itemized wage statements (Lab. Code, § 226), and unfair competition (Bus. & Prof. Code, § 17200) should also be certified, to the extent the meal and rest break claims were certified.

### 1. Decentralization and Disparate Policies and Practices

Sutter Health provides support and administrative services to its corporate subsidiaries, and it is these subsidiaries that provide care to patients. Each of the subsidiaries identified as Affiliates operated independently, was managed by a separate management team, developed separate meal and rest break policies and practices, and devised different methods for implementing those policies. Furthermore, each Affiliate had separate responsibility for communicating meal and rest break rules, and took various approaches in this regard. And within each Affiliate, practices for relieving employees for meal and rest breaks varied from department to department: each department maintained its own system for break relief based on working conditions, patient-care circumstances, and other factors.

In support of these assertions, Sutter Health produced evidence of 61 collective bargaining agreements pertaining to individual Affiliates, along with a table of 66 different "Affiliate Meal and Rest Break Policy" documents. Sutter Health also presented declarations of directors, managers, nurse managers, and putative class members asserting that Sutter Health does not require Affiliates to maintain uniform policies, procedures, compensation practices, staffing practices, or pay rules; Affiliates in fact have their own policies for meal and rest breaks; there are a variety of ways employees were given an opportunity for meal and rest breaks; and nurses care for a variety of patients under differing working conditions.

### 2. Class Certification Requirements

Sutter Health insisted that the Affiliates' meal and rest break policies all met or exceeded California requirements, but in any event the differences among and within the Affiliates precluded class-wide proof of whether (and why) there were meal or rest break violations for the putative class members. In particular, Sutter Health urged, common questions did not predominate over individual questions.[3]

---

[3] Sutter Health also argued that the proposed class representatives were not representative of the class, the proposed classes were not ascertainable, and there were irreconcilable conflicts among class members.

The putative enterprise-wide RN class consisted of approximately 21,102 registered nurses who worked in California since 2004, and during the class period they held approximately 501 different job titles and worked for 19 Affiliates, in hundreds of different departments, at 30 different acute care hospital campuses. According to declarations Sutter Health produced from putative class members, the ability to take meal and rest breaks depended on their department and work performed: some class members never missed a break, while others voluntarily declined or postponed a break. In addition, Sutter Health pointed out, even the declarations of the named Plaintiffs and other putative class members submitted in support of the certification motion acknowledged that the ability to take meal and rest breaks depended on job duties, supervisors, shift schedules, and the departments and Affiliates in which they worked.

### a. Response to Simpson's Statistical Analysis

Sutter Health asserted that Simpson's report contained numerous methodological flaws and errors. Moreover, it argued, Simpson's statistical analysis of 4.4 million missed, short, or late meal breaks did not demonstrate actual *violations* of applicable law, since nurses may have shortened or postponed their breaks voluntarily, a matter for which neither Simpson's study nor any other class-wide proof could account. To the contrary, an individual inquiry of class members would be necessary to ascertain the reasons the meal break was missed, shortened, or postponed. Furthermore, timekeeping and payroll records told nothing about whether employees took *rest* breaks (or elected not to), because putative class members did not "clock out" for rest breaks.

### b. Response to Understaffing Argument

In response to Plaintiffs' accusation of understaffing, Sutter Health pointed out that Plaintiffs' only evidence consisted of declarations from a relatively small number of employees who claimed their workload prevented them from taking compliant meal and rest breaks. Sutter Health contended that understaffing was not subject to class-wide proof, pointing to evidence that staffing varies from department to department and from shift to shift, and that individual department managers determined staffing based on patient volume and condition.

7

### c. Premium Payments for Missed Breaks

During the proposed class period, the 19 Affiliates paid over $34 million in premium payments to at least 17,168 putative class members for missed meal or rest breaks. Although Plaintiffs declared that they did not receive all premiums they were purportedly owed for missed breaks, Sutter Health contended that the reasons for this varied from person to person. In addition, Sutter Health produced declarations from other putative class members who averred that they had received premium payments when they did not take breaks.

### d. Eigen's Theoretical Survey

Sutter Health attacked Eigen's proposed survey on several grounds. It challenged the assertion that Eigen was a survey design expert at all, since he had never testified at trial as an expert and had never designed a survey for trial. It also noted how little work Eigen had put into the proposed survey in this case: Eigen acknowledged in his deposition that he never drafted any proposed questions for the survey, he could not say how many putative class members he would include in his survey, and he could not provide concrete details about how he would draft or implement it; furthermore, Eigen conceded that after he began to design the survey, he might later determine it was infeasible after all. In addition, Sutter Health argued, results extrapolated from the proposed sampling would not identify which of the Affiliates should bear liability or in what amount.

### e. DLSE Vindications

Sutter Health produced evidence that, since February 2004, the DLSE had decided 29 times that the named defendants had lawfully provided meal and rest breaks to a putative class member who claimed otherwise; DLSE had not ruled in favor of any registered nurse who asserted a meal or rest break claim during the class period.

### f. Sutter Health's Survey Concerning Breaks and Dissuasion

Sutter Health submitted a survey of over 1,200 putative class members conducted by E. Deborah Jay, Ph.D., of Field Research Corporation. As to meal and rest breaks, 82 percent of responding employees asserted that on "most days" they had the

8

opportunity to stop work for at least 30 minutes for meal breaks if they chose, and 57 percent responded that on "most days" they had the opportunity to stop work for at least two 10- or 15-minute personal breaks if they wanted to. In addition, 57 percent said they personally chose to skip, shorten, or postpone their meal breaks even when they had an opportunity to take one, and 35 percent said they had chosen to skip one or more rest breaks.[4]

On the issue of alleged dissuasion from taking breaks or from seeking compensation for noncompliant breaks, 87 percent indicated that their manager or supervisor never discouraged or prevented them from stopping work for a meal break they wanted to take, and 82 percent indicated their manager or supervisor never discouraged or prevented them from taking a rest break. Some 63 percent indicated they had the opportunity to request premium pay for noncompliant meal breaks, 48 percent of whom received such payment; 42 percent of those surveyed had the opportunity to request a premium payment for noncompliant rest breaks, 23 percent of whom received a premium payment.

D. Trial Court's Denial of Certification

After a hearing on November 16, 2012, the court issued a 32-page written order denying class certification on December 12, 2012.

As to the putative enterprise-wide RN class, the court concluded that Plaintiffs' proposed statistical method of class-wide proof of meal period violations was inadequate for two reasons: (1) the statistics did not necessarily show 4.4 million violations, since employees might have elected to waive the break, and that was not a matter subject to enterprise-wide proof; and (2) even assuming the existence of 4.4 million violations, its significance was unclear since the enterprise was comprised of 19 separate Affiliates, each with multiple departments and different meal and rest break policies. Thus,

---

[4] On the other hand, as appellants point out, the survey also showed that on "most days" over 14 percent of the surveyed class did *not* have the opportunity to stop work for a 30-minute meal period they wanted to take, and 38 percent of respondents reported that on "most days" they did *not* have the opportunity to take two 10- to 15-minute personal breaks they wanted to take.

violations of the applicable law would require individualized inquiries, not common proof. In addition, Plaintiffs failed to show that the shortcomings of the statistical evidence could be cured either by their proposed survey or by Sutter Health's completed survey: even if Sutter Health's survey showed there were violations, it did not show the violations were a result of a uniform policy common to all class members. And also insufficient was Plaintiffs' assertion that they could analyze staffing ratios and other data to determine whether there was an adequate number of qualified relief nurses, since the analysis would require a huge data entry effort, and Plaintiffs had not even attempted the work necessary to determine whether the data was susceptible to such an analysis.

As to rest breaks, the court found there was no class-wide proof for certification purposes, because Plaintiffs had no statistical evidence of any violations (since employees were not required to record the time they took for such breaks), and Plaintiffs' proposed survey and anecdotal evidence from some putative class members was insufficient.

As to the putative SHSSR class, the court concluded that the same type of problems in certifying the enterprise-wide RN class precluded certification of the SHSSR class, in light of the differences among the departments within the hospitals comprising SHSSR. And as to Plaintiffs' argument that nurses were dissuaded from seeking premium pay for noncompliant meal and rest breaks, the court found that declarations from putative class members did not reflect a uniform policy that would warrant class certification.

Finding that common questions did not predominate over individual questions, the court denied Plaintiffs' motion for class certification without deciding the issues of ascertainability, numerosity, typicality or adequacy of counsel.

This appeal followed.

## II.  DISCUSSION

Appellants contend the court erred in denying certification of the enterprise-wide RN class and, alternatively, the SHSSR class. We briefly revisit the legal requirements for certification of a class action, and then examine appellants' contentions.

10

A.  Class Actions

A party seeking class certification must show "the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker, supra,* 53 Cal.4th at p. 1021; see Code Civ. Proc., § 382.)  The community of interest requirement is comprised of three factors:  predominant common questions of law or fact; class representatives with claims or defenses typical of the class; and class representatives who can adequately represent the class.  (*Brinker, supra*, 53 Cal.4th at p. 1021.)  In this appeal, the sole issue is whether Plaintiffs established the predominance of common questions.

The element of predominant common questions requires, essentially, that factual and legal questions common to the claims of the putative class members predominate over issues affecting members individually.  (See *Brinker, supra*, 53 Cal.4th at p. 1021 ["The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants"].)  Generally, "if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages."  (*Id*. at p. 1022.)  To determine the issue, the trial court "must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate."  (*Id*. at p. 1025.)

Whether to certify a class rests within the broad discretion of the trial court.  (*Brinker, supra,* 53 Cal.4th at p. 1022.)  Generally, an order denying certification will not be disturbed unless it is (1) unsupported by substantial evidence, (2) rests on improper criteria, or (3) rests on erroneous legal assumptions.  (*Id*. at p. 1022.)  Because predominance is a factual question, we review the court's finding on this point for substantial evidence.  (*Ibid*.)  That is, we will affirm if substantial evidence supports the court's ruling, *even if* there is evidence that might also support a contrary ruling.

11

(*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 988 (*Dailey*)) [appellate court does not reweigh evidence, but draws all reasonable inferences supporting the order].)

B. The Enterprise-Wide RN Class

Plaintiffs contend that, in light of their legal theories, the following factual questions were common to members of the RN class and predominated over questions affecting members individually: (1) whether understaffing of nurses by Sutter Health resulted in pervasive rest and meal period noncompliance, and (2) whether uncompensated meal period violations were the result of a pervasive practice of dissuading nurses from applying for premiums for missed or noncompliant breaks.[5]

1. Understaffing of Nurses and Rest and Meal Period Noncompliance

In our consideration of appellants' primary legal theory, we first address whether their claims of understaffing, meal period violations, or rest period violations were amenable to class-wide proof based on the evidence provided to the trial court. We then address appellants' further arguments that the court applied the incorrect legal standard and made other specified errors.

a. Understaffing

Plaintiffs' support for their claim of class-wide proof of Sutter Health's alleged understaffing and failure to provide break relief was anecdotal evidence from declarations of some putative class members. There was no evidence of a *class-wide*

---

[5] Appellants' opening brief also posits two other common questions: whether Sutter Health's practices in failing to compensate for missed breaks violated California's unfair competition law, and whether Sutter Health's rest and meal period noncompliance subjected it to penalties for unlawful wage stubs and late pay. In the trial court, however, appellants acknowledged that their claims for unfair competition, unlawful wage stubs, and late pay were derivative claims that could be certified only to the extent of their claims for meal and rest break violations. Appellants also contend in a footnote in their opening brief that "the issue of whether Sutter Health is the joint employer as to the provisional meal period violations" is a common question. Our conclusion that meal period violations cannot be shown by common proof (based on the record in this case) indicates that these other questions also cannot be resolved by common proof, and that in any event the court did not err in concluding that common questions did not *predominate*.

12

policy that precluded adequate break relief; to the contrary, there was significant evidence that staffing compliance depended on circumstances specific to the nurses' working environment, which varied from department to department. And although Plaintiffs *argued* they could analyze nurse staffing plans and hospital data to determine whether break relief was provided, it was not unreasonable for the court to find that Plaintiffs had not established the viability of such an analysis, since they had not even performed the required data entry.

Appellants urged it was unnecessary to actually perform a thorough review and analysis of the data, because they had discussed this evidence merely to show that nurses had to be provided relief in order to take a break (unlike an office or sales position), not to prove that the staffing ratio was actually deficient. But this only hurts appellants' case: If indeed they were not offering this type of evidence as an indication of class-wide proof of deficient staffing ratios, there was nothing else to indicate that staffing deficiencies were subject to class-wide proof.

Accordingly, the record supports the conclusion that proof of understaffing depended on factual issues unique to the particular department or affiliate, and it was therefore not a common issue. (*Kimoto v. McDonald's Corps.* (C.D.Cal., Aug. 19, 2008, No. CV 06-3032 PSG) 2008 U.S.Dist. Lexis 86203, at p. *17 [where plaintiff's theory was that restaurant was too busy to give employees a meaningful opportunity to take a meal or rest break, class certification was denied because assessing whether an employee was authorized by a manager to take the break would require an individualized inquiry].)

### b. Meal Period Noncompliance

An employer generally must provide a 30-minute meal period to all nonexempt employees who work more than five hours, and a second 30-minute meal period to employees who work more than 10 hours. (Lab. Code, § 512, subd. (a); Industrial Welf. Com. Wage Order No. 5-2001, subd. 11 (Cal. Code Regs., tit. 8, § 11050, subd. 11).) "The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so."

13

(*Brinker, supra,* 53 Cal.4th at p. 1040.)  What will suffice as compliance in this regard may vary from industry to industry.  (*Ibid.*)

The trial court in this case did not err in concluding that meal period violations could not be established on a class-wide basis.  Although Simpson's statistical evidence suggested over 4.4 million instances in which employees did not receive a compliant meal period, these 4.4 million incidents were not necessarily *violations*.  A missed meal period would not constitute a violation if the employee waived the offered meal period or otherwise voluntarily shortened or postponed it.  (*Brinker, supra*, 53 Cal.4th at pp. 1040-1041.)  Indeed, subdivision 11(D) of Wage Order No. 5-2001 allows for voluntary written agreements to waive meal periods.

Here, the evidence indicated that some putative class members did, in fact, miss meal periods because they waived them:  Sutter Health provided evidence that many putative class members signed waivers, and a number of declarants and 57 percent of survey respondents said they voluntarily chose to delay, shorten, or skip meal breaks offered to them.

Moreover, the evidence indicated that the issue of employee waivers, and other voluntary elections to forego full breaks, could not be addressed by class-wide proof.  First, the employees' written waiver forms—to which Simpson did not have access— were contained in the employees' individual personnel files.  Second, declarations from putative class members asserted that the nurses' ability to take meal breaks varied from department to department and affiliate to affiliate, depending primarily on differences in work responsibilities; indeed, even the declarations presented by Plaintiffs suggested that their ability to take meal and rest breaks varied from department to department, hospital to hospital, and shift to shift, depending on the type of work they performed, their supervisor, and other factors.  From this evidence, it may reasonably be inferred that the question of whether a missed meal break was due to the employer's de facto failure to allow it—or from the employees' voluntary choice not to take it—would

14

necessitate an individualized inquiry (or at least not a class-wide one). Accordingly, Simpson's statistical evidence was insufficient to justify class certification.[6]

Instructive in this regard is *Ordonez v. Radio Shack, Inc*. (C.D.Cal., Jan 17, 2013, No. CV 10-7060-CAS) 2013 U.S.Dist. Lexis 7868 (*Ordonez*). There, the plaintiff sought certification of a class of sales associates whose employer purportedly deprived them of meal and rest periods. The plaintiff asserted there were de facto uniform policies requiring the sales associates to ask permission to take a break (to avoid understaffing) and statistical evidence that over half the putative class members had missed, short, or late meal periods. (*Id.* at pp. *4-5, 20.) In denying certification, the court found, "[P]laintiff's expert repeatedly mischaracterizes any late, short, or missed meal periods as 'violations'—in fact, there is no way of determining on a classwide basis whether these were violations, a legal conclusion, or whether individual class members voluntarily opted to start their meal break late, cut it short, or not take a break at all." (*Id.* at pp. *22-23.)

To similar effect is *Washington v. Joe's Crab Shack* (N.D.Cal. 2010) 271 F.R.D. 629. There, the plaintiff alleged that restaurant employees were deprived of the right to meal and rest breaks, and sought certification of a class based on declarations from the plaintiff and other present or former employees, along with records indicating that eligible breaks were not taken. Certification was denied. The court explained that an analysis of data could not establish a policy or practice where "plaintiff has failed to adequately explain how that analysis works and exactly what the data shows." (*Id.* at p. 640.) Further, the court explained: "In the absence of any common policy, an individualized inquiry will be required to determine whether any single employee failed

---

[6]     The possibility of employee waivers would not preclude class treatment if the employer had an official *class-wide policy* precluding compliant breaks (see *Brinker, supra*, 53 Cal.4th at p. 1033) or requiring employees to waive those breaks (see *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 234). But Plaintiffs neither presented evidence of, nor premised their legal theory on, any such official class-wide policy. At most, they urged a de facto policy, but failed to show it existed on a class-wide basis.

15

to take a meal break because he/she was too busy, and also to determine whether a particular employee signed a waiver based on a decision not to take meal breaks. For this reason alone, common issues do not predominate with regard to the meal break claim. In addition, plaintiff's suggested solution of simply examining time records to determine when meal breaks were not taken would be unavailing, as that would not answer the question why the employees did not take breaks." (*Id*. at p. 641; see also *Purnell v. Sunrise Senior Living Mgmt., Inc.* (C.D.Cal., Feb. 27, 2012, No. SA CV10-00897 JAK) 2012 U.S.Dist. Lexis 27430, at p. *16 [time records and expert analysis of potential meal break violations did not reflect class-wide proof, because individualized inquiries would be needed to determine why employees missed the breaks].)[7]

Furthermore, appellants did not establish that survey evidence would cure the shortcomings of their statistical evidence. In light of Eigen's testimony that he never drafted the actual survey questions, could not say how many putative class members would be included in the survey or provide concrete details about the survey's implementation, and might later decide the survey was infeasible, it was not error for the court to conclude that Plaintiffs' mere proposal of a survey was insufficient to establish the predominance of common issues or the manageability of individual inquiries. (See *Dailey, supra*, 214 Cal.App.4th at p. 998 ["We have found no case, and Dailey has cited none, where a court has deemed a mere proposal for statistical sampling to be an adequate evidentiary *substitute* for demonstrating the requisite commonality"]; *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1432 [it "is not sufficient . . . simply to mention a procedural tool; the party seeking class

---

[7] Appellants contend that cases involving employees in a restaurant or retail store are distinguishable because appellants work as nurses in a hospital, and they cannot take breaks without qualified break relief. A concern about understaffing, however, was also present in *Ordonez, supra,* 2013 U.S.Dist. Lexis 7868, at pp. *4-5. Moreover, even if the staffing *standard* and need for adequate break relief was common to all class members, the point is that Plaintiffs failed to show any means of class-wide proof that there was, in fact, *deficient* staffing that led to meal and rest break *violations*.

certification must explain how the procedure will effectively manage the issues in question"].)

Appellants urge that the question of employee waivers is irrelevant, because waiver is a matter that *defendants* would have to prove, based on a concurring opinion in *Brinker*. We address this assertion *post*, but it suffices to say at this point that whether the plaintiff is required to demonstrate an actual violation of the meal period laws (and thereby show that the missed meal period was *not* due to an employee waiver) or the plaintiff is required to prove only a presumptive violation with evidence that a meal period was missed (leaving it to the employer to show, as an affirmative defense, that the missed period was due to an employee waiver), the fact remains that the possibility of employee waiver requires individualized proof, based on the record in this case. Accordingly, it was not error for the court to conclude that meal period violations were not subject to class-wide proof. (See *Brinker, supra,* 53 Cal.4th at pp. 1052-1055 (conc. opn. of Werdegar, J.); see generally *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450 [affirmative defenses may be considered in deciding whether common issues of law or fact predominate].)

Cases on which appellants rely actually confirm that class certification was properly denied. In *Sotelo v. Medianews Group, Inc.* (2012) 207 Cal.App.4th 639, the Court of Appeal affirmed the trial court's *denial* of class certification because, like the Plaintiffs here, the plaintiffs were unable to show any uniform policy or practice that would establish class-wide liability for meal and rest break violations. (*Id.* at pp. 652-655.) In *Mendez v. R+L Carriers, Inc.* (C.D.Cal., Nov. 19, 2012, No. C 11-2478 CW) 2012 U.S.Dist. Lexis 165221, the court *denied* certification of a putative class of truck drivers for meal and rest break claims, finding, among other things, that the employer's alleged informal policy of discouraging breaks was not susceptible to common proof in light of the variance among terminals in rest break policies. (*Id*. at pp. *33-38.) Although the district court certified a subclass of "city drivers" because there *was* a common practice of preventing drivers from taking their breaks for *that*

17

group (*id*. at pp. *34-36), the evidence in the matter before us supported the conclusion that there was no common policy for any putative class or subclass in this case.

Appellants' reliance on other decisions is misplaced. *Pina v. Con-Way Freight, Inc.* (N.D.Cal., Apr. 12, 2012, No. C 10-00100 JW) 2012 U.S.Dist. Lexis 59505 is distinguishable because, unlike appellants in this case, the plaintiffs in *Pina* demonstrated that their employer's informal policies of discouraging breaks *was* susceptible to common proof; all class members worked in the same facility and there was no apparent assertion that different policies and practices applied to different class members. (*Id*. at pp. *19-20.) Similarly, in *Dilts v. Penske Logistics, LLC* (S.D.Cal. 2010) 267 F.R.D. 625, the district court certified a class of drivers because they were *all* subject to the same unlawful common policy of automatically deducting pay for meal breaks (whether or not the breaks were taken) and refusing to provide a second meal break; in addition, the drivers were all subject to a common scheduling practice, and they were uniformly deprived of premium pay. (*Id*. at pp. 636-638.) And in *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286 (*Jaimez*), the plaintiffs' claims were amenable to class treatment due to evidence that the employer maintained "uniform policies and practices" affecting all putative class members. (*Id*. at pp. 1299-1300.)

Appellants contend that another appellate decision, issued after the trial court's ruling in this case, held that an employer cannot preclude certification by raising individualized issues about the employees' reasons for missing a meal or rest break. (*Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 725-726 (*Benton*).) *Benton*, however, is inapposite. In *Benton*, each of the declarants averred that they were not told what a meal or rest break was or whether they were entitled to one, and the plaintiffs claimed their employer was liable because it had no class-wide policy authorizing statutorily mandated breaks. (*Id*. at p. 707.) Under *that* theory of liability—based on the absence of an authorizing policy required by *Brinker*—the common predominating question was the legality of the employer's failure to adopt the class-wide policy, and the class could be certified even if some class members were nevertheless

18

able to take breaks due to the different work they performed for different staffing companies that followed their own break practices. (*Id.* at pp. 725-726.) In the matter before us, by contrast, appellants do not pursue a theory that Sutter Health failed, on a class-wide basis, to adopt a policy authorizing the required breaks.

In sum, appellants fail to show that the court erred in concluding that meal period violations were not susceptible to class-wide proof, and that individual issues could not be adequately managed by the methods Plaintiffs proposed.

### c. Rest Period Noncompliance

An employer must authorize and permit employees to take 10-minute rest breaks for every four hours of work or major fraction thereof. (*Brinker, supra*, 53 Cal.4th at p. 1032.) Because the putative class members did not clock out for rest breaks as they did for meal periods, however, Plaintiffs had no statistical evidence of any rest break violations. That left anecdotal evidence contained in the declarations of Plaintiffs and other putative class members, along with the results of Sutter Health's survey. And although that survey indicated 43 percent of surveyed nurses did not, on most days, have the opportunity to stop work for at least two 10- or 15-minute rest breaks, the survey also showed that 35 percent chose to skip rest breaks that were offered to them. In light of the individualized inquiry needed to determine whether the short or missed rest breaks constituted actual violations or were merely a reflection of the employee's voluntary choice, the court correctly concluded that Plaintiffs' theory of noncompliant rest breaks (due to understaffing) was not amenable to class-wide proof.

We now turn to the remainder of appellants' arguments.

### d. Trial Court's Reference to a Uniform Policy Requirement

Appellants contend the court applied an incorrect legal standard because it asserted that Plaintiffs needed to prove that meal and rest period violations were the result of a "uniform policy consistently applied" to the Affiliates. Appellants urge that *Brinker* does not *require* plaintiffs to prove a uniform policy in order to attain certification, and

19

that they may show in some other way that the action is triable on a class-wide basis due to the predominance of common issues.[8]

The trial court did not base its ruling on an erroneous assumption of law. In its order denying certification, the court accurately set forth the governing legal standard, asserting that the question was whether Plaintiffs' theory of recovery was "likely to prove amenable to class treatment" and whether the defendants' liability "can be determined by facts common to all members of the class." The court's reference to the concept of a "uniform policy" should be of no surprise, for two reasons. First, proof of a noncompliant uniform policy *is* the means our Supreme Court noted for establishing the predominance of common questions. (*Brinker, supra*, 53 Cal.4th at pp. 1033, 1052.) Second, it was *appellants* who initially injected the idea of a uniform policy into the case. In the *Aymer* complaint, appellants alleged that Sutter Health had "a consistent policy" of "failing to pay legal hourly and overtime wages" and requiring nurses to work without required rest and meal periods. And in their memorandum of points and authorities in support of their certification motion, Plaintiffs asserted: "California law specifically authorizes class actions when a defendant's *corporate policies* result in injury to a group of plaintiffs. Testimony from a class representative, coupled with *proof of company-wide policies and practices* is sufficient to prove common issues affecting the class predominate over individual issues. [Citation.]" (Italics added.)

---

[8] In part, the court stated: "In evaluating this point/counterpoint debate [concerning the significance of Sutter Health's survey], it is useful to step back for a moment and consider exactly what it is in a case such as this a plaintiff actually needs to prove and whether, in a given case, that is susceptible to class-wide proof. Plaintiffs approach that question as if the question is simply whether 'violations' of the relevant wage order occurred, and their entire statistical presentation is to show that they did occur. But for the case to be tried on a class-wide basis, the question is somewhat different—namely, whether there was 'a uniform policy consistently applied to a group of employees . . . in violation of the wage and hour laws.' (*Brinker*[, *supra*, 53 Cal.4th] at p. 1033 [discussing rest breaks].) Thus the threshold burden on Plaintiffs is not merely to show 'lots of violations' but rather to show that—whether there were a hundred or a million—the violations were the result of a 'uniform policy consistently applied.' "

Moreover, in context, the court's references to the need to establish a uniform policy of noncompliance reflected Plaintiffs' utter failure to show the potential for common proof on any *other* basis. The point of the court's reference to a "uniform policy consistently applied" was the requirement that there be, in the court's words, "a common mode of proof for all members" of the class or subclass. The court fully examined Plaintiffs' statistical evidence and its failure to account for factors that would determine whether or not actual violations had occurred. It considered Plaintiffs' evidence of Sutter Health's practices, and the fact that those practices differed significantly from affiliate to affiliate. In such circumstances, the absence of proof of a noncompliant uniform policy would preclude class certification. (See *Brinker, supra,* 53 Cal.4th at p. 1052 ["[W]here no substantial evidence points to a *uniform, companywide policy*, proof of off-the-clock liability would have had to continue in an employee-by-employee fashion," italics added].)

Appellants fail to establish error.[9]

---

[9] To expound a bit on this point, we revisit *Brinker*'s analysis. *Brinker* held that, to comply with the law, an employer must have a policy authorizing the required breaks. (*Brinker, supra*, 53 Cal.4th at p. 1033 [rest breaks].) If the employer's policy does *not* authorize the breaks, the possibility that an employee was nonetheless able to take those breaks merely goes to damages, not liability. (*Ibid.*) Therefore, *if* the plaintiff's legal theory is that the employer's over-arching *policy* does not comply with the law because it does not *authorize* the required breaks, liability can be decided by the class-wide question of whether the policy applicable to all class members complies with the law or not; accordingly, common questions predominate and a class may be certified. (*Ibid.*; *Jaimez, supra*, 181 Cal.App.4th at p. 1301; *Faulkinbury, supra*, 216 Cal.App.4th at pp. 233-237; *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, 1151.) If, on the other hand, the employer's policy *does* facially comply with the law, then the plaintiff could establish liability by showing that, notwithstanding the policy, the company in *practice* denied employees their required breaks. (*Brinker, supra*, 53 Cal.4th at p. 1040.) To obtain class certification on *that* legal theory, the plaintiff would have to show that the noncompliant practice was subject to class-wide proof for some reason other than the facially valid policy. In the matter before us, substantial evidence supported the conclusion that Plaintiffs did not establish either a noncompliant uniform policy *or* a common practice subject to class-wide proof on some other basis.

21

*e.* Brinker *Concurrence and Waiver as Affirmative Defense*

Appellants contend the court erred in denying certification based on the individual inquiry necessary to ascertain whether employees had waived their meal breaks, because waiver is an affirmative defense. They point to Justice Werdegar's concurrence in *Brinker*, which asserted, "If an employer's records show no meal period for a given shift over five hours, *a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided*." (*Brinker, supra,* 53 Ca1.4th at p. 1053, italics added.) They urge that their statistical evidence of missed meal periods gave rise to a presumption of violations because the *Brinker* concurrence is "the law of the land." Their argument is unavailing.

In the first place, the rebuttable presumption referenced in the *Brinker* concurrence is not the "law of the land." Concurring opinions do not constitute binding precedent. (*In re Marriage of Dade* (1991) 230 Cal.App.3d 621, 629; *People v. Superior Court (Persons)* (1976) 56 Cal.App.3d 191, 194.) And although Plaintiffs cite four cases to support their claim that other courts have applied the presumption, none of those cases is apposite here. For example, *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, 1144-1145, and *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 230-231, noted the presumption *but did not rely on it*; furthermore, neither case was published before the court's written order denying certification. In *Avilez v. Pinkerton Government Servs.* (C.D.Cal. 2012) 286 F.R.D. 450, the court did not even mention the presumption. And *Ricaldai v. U.S. Investigations Services, LLC* (C.D.Cal 2012) 878 F.Supp.2d 1038, 1043, a federal district court case of no precedential value, is distinguishable because it involved an employer who did not record *any* meal periods, and addressed summary judgment rather than class certification. Accordingly, the trial court did not abrogate existing law by declining to apply the rebuttable presumption mentioned in the *Brinker* concurrence.

Of course, we may look to the concurring opinion in *Brinker* for guidance in assessing the significance of a plaintiff's statistical evidence of noncompliant meal periods. But even if we (or the trial court) were to conclude that Sutter Health's time

22

records reflecting missed, late, or short meal periods created a rebuttable presumption of violations, the fact remains that the adjudication of those presumed violations would ultimately turn on individualized rather than class-wide proof in this case.

According to the *Brinker* concurrence, an employer's assertion that an "employee waived the opportunity to have a work-free break" would be an "affirmative defense" for the employer to prove, and individual issues arising from an affirmative defense pose no *per se* bar to certification. (*Brinker, supra,* 53 Cal.4th at p. 1053 (conc. opn. of Werdegar, J.).) "Instead, whether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues." (*Id.* at p. 1054.) Because the employer in *Brinker* had not shown that waiver would render a certified class categorically unmanageable, Justice Werdegar opined that "it remains for the trial court to decide on remand, in the fullness of its discretion, whether in this case methods exist sufficient to render class treatment manageable." (*Id.* at p. 1055.)

For the reasons stated *ante*, ample evidence supported the trial court's conclusion that the potential for waivers or other factors necessitated individualized inquiries and precluded class-wide proof of liability. The court decided, in the "fullness of its discretion," that class treatment of meal period claims would not be manageable based on the record before it, and appellants have not established that the court abused its discretion in this regard. (See *Ordonez, supra,* 2013 U.S.Dist. Lexis 7868, at p. *21 n.9 ["[T]o the extent that plaintiff relies on a 'presumption' that arises from the empirical evidence that many class members had short, late, or missed meal periods, the Court finds that defendant has rebutted this presumption here. [Citation to *Brinker* concurrence.] As noted, plaintiff has failed to identify any common policy that uniformly deprived employees of the opportunity to take meal breaks, such that individualized inquiries could be avoided"].)

### f. *Trial Court's Reliance on* Tien *and* Hernandez

In its written order denying certification, the trial court cited two pre-*Brinker* cases which, after the trial court issued its ruling, were depublished by our Supreme

23

Court.  (*Tien v. Tenet Healthcare Corp.* (Oct. 4, 2012) B214333, opn. ordered nonpub. Jan. 16, 2013; *Hernandez v. Chipotle Mexican Grill, Inc*. (Aug. 21, 2012) B216004, opn. ordered nonpub. Dec. 12, 2012.)  The trial court had cited *Tien* and *Hernandez* for the court's proposition that "[a]bsent a showing of commonality across multiple locations or even within a location, an effort to certify fails."  In context, the trial court was discussing the absence of an "over-arching policy" governing the Affiliates and, more generally, the significance of differences between and among those Affiliates.

Appellants have failed to establish error in this regard.  First, there is no question that *Tien* and *Hernandez* were good law at the time the trial court in this case cited them.  Second, since our Supreme Court did not grant review in *Tien* or *Hernandez*, we do not know *why* the Supreme Court depublished them, and it is not our place to indulge in speculation.  Third, the proposition for which the trial court cited *Tien* and *Hernandez* is an accurate statement of the law, supported by other legal authorities, for the reasons we explained *ante*:  in the absence of a noncompliant uniform policy, individualized questions necessary for the adjudication of liability may preclude class certification. (E.g., *Brinker*, *supra*, 53 Cal.4th at p. 1052.)

### g.  Court's Misstatement Regarding Percentage of Violations

Plaintiffs argued in the trial court that there were over 4.4 million potential meal period violations out of more than 7 million shifts, and therefore potential violations had occurred in roughly 63 percent of those shifts.  In its order, however, the trial court attributed this 63 percent figure not to the percentage of shifts in which potential violations arose, but to the percentage of potential violations that had been "cured" by, for example, payment of premium pay.  Appellants contend this was "an error of such magnitude to serve as the basis for finding that the court's denial of certification was not supported by substantial evidence."

We disagree.  The court did not rely on a 63 percent "cure" rate in deciding appellants' motion.  Instead, the court denied certification because common questions did not predominate, and the predominance of common questions did not turn on the number

24

of violations that were cured or the percentage of shifts that were missed, but on the lack of common policies or practices among the 19 Affiliates.

Appellants argue that the court believed the magnitude of potential violations was important in assessing the propriety of certification, based on the following statement by the court at the hearing: "You see, the problem is, how big's the number? If you put up numbers there where two percent of meal breaks were missed, and you said, 'Certify it. Judge—Judge, look. Two percent were missed.' And the defense gets up and says, 'Well, you know, they could have been consensual, et cetera, et cetera.' That's a different case than if you get up and said, 'Look, 98 percent were missed, and there's no compensation.' " But appellants misperceive the court's comment. In context, the court was asking how it could rely on Plaintiffs' evidence of 4.4 million violations, in light of the fact that some portion of those missed shifts were due to waivers and therefore not violations at all. As the court explained, "[The parties] are asking me to draw inferences from the size of the percentages, and I need to be concerned how reliable are the percentages." We discern no prejudicial error from the court's mistaken reference to a 63 percent cure rate.

For the foregoing reasons, the trial court did not abuse its discretion in denying class certification based on Plaintiffs' theory that members of the RN class were deprived of meal or rest breaks due to understaffing.

### 2. Dissuading Nurses from Applying for Premiums

Plaintiffs' alternative theory was that Sutter Health maintained a pervasive practice of dissuading nurses from applying for premium pay for missed or noncompliant breaks, or failed to advise the nurses of their right to premium payments. Appellants contend the court ignored this theory, and the order denying certification is therefore not supported by substantial evidence. (Citing *Bluford v. Safeway Inc.* (2013) 216 Cal.App.4th 864, 873.) Further, they contend, the class should have been certified with respect to the dissuasion theory.

### a. Background

An employer's dissuasion of employees from taking meal or rest breaks may result in the employer's liability, even if the employer has a written policy that complies with the law. (See *Brinker, supra,* 53 Cal.4th at p. 1040; *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962-963.) This type of dissuasion theory can be subject to class-wide proof. (*Jaimez, supra,* 181 Cal.App.4th at pp. 1304-1305 [common scheduling policy that made taking breaks extremely difficult].) By extension, appellants argue, an employer's dissuasion of employees from applying for premium pay, or its failure to advise employees of their entitlement to premium pay, may result in employer liability. And, they urge, this type of dissuasion theory is susceptible of class-wide proof as well.

Based on declarations from putative class members, appellants contend Sutter Health dissuaded nurses from obtaining premium pay in the following ways: (1) discouraging premium pay requests, often by mentioning the possible need to lay off employees amid budget concerns; (2) frustrating putative class members' attempts to request premium pay by requiring them to obtain a supervisor's preapproval based on a specific medical emergency; and (3) refusing legitimate payment requests. Appellants also point to Sutter Health's survey, in which a percentage of former and current employees indicated they did not have the opportunity to request premium pay, were uncertain they could ask for it, or never received it.

### b. Analysis

As a threshold matter, we reject appellants' aspersion that the trial court ignored their dissuasion theory. The dissuasion theory was included in the Plaintiffs' motion papers, and it was clear from the court's comments at the hearing that it was familiar with those papers. The dissuasion theory was discussed at the hearing, and it was expressly acknowledged by the court; indeed, the court specifically observed that Plaintiffs' statistical evidence was insufficient to demonstrate class-wide proof of the dissuasion theory, because it did not show whether the Affiliates all followed the same policy. And in its written order, the court repeatedly alluded to Plaintiffs' dissuasion theory and the

26

evidence Plaintiffs submitted to support it: the court noted Plaintiffs' argument that there were "common practices of disciplining for excessive premium payments" and observed that Plaintiffs' evidence of any such enterprise-wide policy or practice was "virtually nonexistent"; the court noted the SHSSR declarants' testimony that they were unlawfully discouraged from taking breaks or claiming premium pay; and the court cited Plaintiffs' evidence that EMC discouraged or disciplined nurses for reporting too many missed breaks. Moreover, while the court did not include a separate section in its written order dealing exclusively with dissuasion, the principles on which it denied certification—a failure to show a uniform policy or practice or other means of common proof—was plainly meant to apply to appellants' dissuasion theory as well as appellants' theory that breaks were denied due to understaffing. (See *Wilson v. Sunshine Meat & Liquor Co*. (1983) 34 Cal.3d 554, 563 [all presumptions are indulged to support the trial court's opinion on matters as to which the record is silent, and error must be affirmatively shown].)

We also conclude that substantial evidence supports a finding that common questions did not predominate in regard to the dissuasion theory. There was no common, class-wide policy discouraging requests for premium pay, and the actual practices in regard to premium pay varied among the Affiliates and within their departments. Plaintiffs' evidence showed that handbooks and communications to employees informed nurses that they *were*, in fact, entitled to receive premium pay. While some Plaintiffs claimed they were unaware of their right to request meal and rest break premiums, others were aware. While some Plaintiffs allegedly felt pressure not to request premium pay, others did not. Indeed, Sutter Health's survey indicated that only four percent of putative class members were denied a meal premium payment, and only three percent were denied a rest break premium. In light of the evidence that the process for assessing premiums and informing employees of their rights depended on the particular affiliate in which the class member was employed, Plaintiffs' evidence—including declarations that certain unidentified supervisors

27

chastised some class members for seeking premium payments—did not establish that their dissuasion theory was subject to *class-wide* proof. [10]

In sum, appellants fail to establish that the court erred in denying certification of the enterprise-wide RN class based on their dissuasion theory.

C.  SHSSR Class

Appellants contend the trial court should have certified the SHSSR class of nurses, who were employed by a number of hospitals within the Sutter Health Sacramento Sierra Region.  As to this putative class, appellants again assert theories of missed meal and rest break violations and dissuasion.

At the outset, we observe that Plaintiffs devoted just one paragraph of their 47-page opening memorandum of points and authorities to a SHSSR class, asserting nothing more than it would be easy to conduct an analysis of Sutter Health's data to establish meal period violations.  In its order denying certification, the trial court stated, "[T]he arguments and evidence for the proposed backup class[ ] are not fully developed, and the court is left to imagine from the larger showing what a more modest motion would look like."  Further, the court observed, the subset of statistical evidence attributable to SHSSR had not been "broken out and developed."  Based alone on Plaintiffs' failure to support their request for certification of the SHSSR class in the trial court, we might conclude the trial court's refusal to certify the SHSSR class was not an abuse of discretion.  Nonetheless, just as the trial court proceeded to analyze the certification question for the SHSSR class, we will consider its analysis in light of appellants' arguments in their appellate briefs and the evidence they contend was submitted.

---

[10]  Appellants argue that, based on the 4.4 million potential violations, and evidence that approximately 745,000 premium payments were made, there was only a 17 percent rate of premium payments, indicating that nurses were either unaware of the availability of premium payments or were dissuaded from requesting them.  Since there is no evidence that the 4.4 million incidents were in fact violations for which premium payments were due, appellants' argument is unpersuasive.

### 1. Background

As to appellants' theory of missed breaks, Simpson extracted data from Sutter Health's records relating to nurses who worked at SHSSR for 2006 (not the entire class period), and reported 207,677 potential meal period violations out of 338,677 shifts. Declarations from 11 SHSSR nurses averred that they were not given proper meal and rest breaks. Plaintiffs also presented declarations and deposition testimony complaining of inadequate break relief at SHSSR, as well as grievances from CNA to the effect that SHSSR failed to properly staff units to permit nurses to take their breaks. On the other hand, Sutter Health submitted declarations of other SHSSR nurses, who testified that they regularly received all their meal and rest breaks.

As to their dissuasion theory, Plaintiffs submitted declarations and other evidence which, appellants contend, showed that SHSSR failed to explain adequately to nurses when a premium payment is owed, dissuaded nurses from requesting premium payments (by encouraging them not to, threatening possible layoffs, and requiring preapproval), and disciplined nurses for requesting too many premium payments. Sutter Health countered with evidence that SHSSR consists of seven acute care hospital campuses, employing nurses in many different departments, under diverse policies and practices.

### 2. Analysis

Simply put, the problem that plagued Plaintiffs' attempt to certify its enterprise-wide RN class also provided an adequate basis for denying certification of the SHSSR class. Plaintiffs did not provide evidence, or contend, that SHSSR had adopted a facially invalid class-wide policy concerning staffing, meal periods, rest breaks, or premium pay. Nor did they show other means of common proof of SHSSR's alleged failure to provide nurses with proper breaks or premium pay. Although the SHSSR class involved fewer hospitals than the RN class, it still involved multiple campuses and multiple departments, operating under varying policies and practices. As the trial court noted, the declarations indicated that the hospital units developed their own systems to ensure availability of meal and rest breaks, and the nurses' experience with breaks and access to premium pay varied from unit to unit. Indeed, appellants worked

29

in hospital units in which they did *not* experience difficulty taking all meal and rest breaks to which they were entitled: Aymer admitted receiving all her meal and rest breaks while working as a SHSSR nurse in the Ambulatory Care Department of Sutter General; King experienced no problems receiving meal and rest breaks while working as a SHSSR nurse in that same department; and Frausto experienced no meal or rest break issues while working as a SHSSR nurse in the IV Therapy Department at Sutter Roseville. While the mere fact of variations from unit to unit might not preclude certification in every case, in this case it supported a reasonable inference that there was no class-wide means of establishing meal or rest break violations (due to the individualized inquiry needed to determine the waiver issue) or dissuasion (due to disparate policies or practices by supervisory personnel in the units) for the SHSSR class. And Plaintiffs did not establish that these individual questions could be managed in a way that would justify class treatment of their claims.

In sum, while statistical evidence, surveys, and representative testimony might help provide class-wide proof sufficient for certification of a class in the proper case, there was substantial evidence in *this* case that appellants failed to show how those mechanisms would provide manageable class-wide proof of their legal theories. Appellants have failed to demonstrate error.

## III.  DISPOSITION

The order is affirmed.

30

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.